## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL DANIEL CORDOVA,**

      **Plaintiff,**

      **vs.**                                  **Civ. No. 13-830 LH/KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on Plaintiff's Motion to Remand or Reverse ("Motion"), filed on May 21, 2014. (Doc. 31.) The Commissioner of Social Security ("Defendant") filed a Response on July 17, 2014 (Doc. 33), and Mr. Cordova filed a Reply on December 9, 2014. (Doc. 38.) Having meticulously reviewed the entire record and being fully advised in the premises, the Court recommends that the motion to remand be **GRANTED.**

## I.   PROCEDURAL BACKGROUND

On March 3, 2010, Mr. Cordova filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401. (Tr. 141.) Mr. Cordova alleged a disability onset date of February 28, 2010, because of a right shoulder rotator cuff tear, diabetes, disk degenerative disease, bone spurs, cut tendon left shoulder, depression, arthritis in the wrist, high blood pressure and memory problems. (Tr. 154.)

---

[1] An Order of Reference (Doc. No. 35) was entered on December 4, 2014, referring this case to the undersigned Magistrate Judge to conduct, hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

Mr. Cordova has not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 15.)

Mr. Cordova's application was initially denied on August 5, 2010.  (Tr. 56.)  On September 2, 2010, at reconsideration, Mr. Cordova alleged disability based on the conditions set forth above and the additional conditions of vertigo, arthritis/carpal tunnel and fracture of right hand, elevated liver enzymes, poor control of diabetes, deep vein thrombosis of right leg, and epidural steroid for lower back pain.  (Tr. 199-200.)  Mr. Cordova's application was denied again at the reconsideration level on November 8, 2010.  (Tr. 56, 57.)  On January 27, 2011, Mr. Cordova requested a hearing by an Administrative Law Judge ("ALJ"), and the ALJ conducted a hearing on March 28, 2012. (Tr. 30-55, 68.)  On June 22, 2012, the ALJ issued an unfavorable decision.

Mr. Cordova filed an appeal with the Appeals council, but on July 25, 2013, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (Tr. 1-3.)  Mr. Cordova timely filed the instant action for judicial review of the ALJ's decision on September 3, 2013. (Doc. 1.)

## II.  STANDARD OF REVIEW

Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the Commissioner's final decision[2] was supported by substantial evidence; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).  If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[2] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews

decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). The court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its own judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). While the court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III. SEQUENTIAL EVALUATION PROCESS

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or

---

the ALJ's decision as the Commissioner's final decision.

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. § 404.1520, 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant bears the burden of demonstrating that: (1) he is not engaged in "substantial gainful activity;" *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and either* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the Claimant cannot show that his impairment meets or equals a Listing at step three, then the ALJ determines the claimant's residual functional capacity ("RFC"), 20 C.F.R. § 416.920(e), and at step four compares his RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. § 416.920(f). If the Claimant is not prevented from performing his past work, then he is not disabled. *Id.* If however the Claimant proves that he is unable to perform his "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the

claimant is able to perform other jobs existing in significant numbers in the national economy, considering his RFC, age, education, and work experience.  *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003); *Grogan*, 399 F.3d at 1261; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV. FACTUAL BACKGROUND

Plaintiff Samuel Daniel Cordova ("Mr. Cordova") was born on May 21, 1959.  (Tr. 141.) Mr. Cordova completed high school (Doc. 155), and has past relevant work experience as a laborer, heavy equipment operator, and caregiver.  (Tr. 156.)  Mr. Cordova's alleged disability onset date is February 28, 2010.  (Tr. 141.)

### 1.  Mr. Cordova's Relevant Medical History[4]

#### A.    Musculoskeletal Issues (Shoulders, Wrists/Hands and Degenerative Disc Disease)

##### (1)    General Overview

Mr. Cordova was followed for his ongoing musculoskeletal issues by Dr. Kristine McCoy ("Dr. McCoy") and James Martin, PA-C ("PA-C Martin") of El Centro Family Health and Peñasco Clinic, as well as Dr. Theresa Genovese-Elliott ("Dr. Elliott") and Laura Holmes, PA-C ("PA-C Holmes"), of Spine & Pain Institute of Santa Fe.  The Administrative Record contains medical records from November 2009 through March 2012.  Over the course of those twenty-nine months, Mr. Cordova saw these healthcare providers with various musculoskeletal complaints approximately twenty-four times.  (Tr. 408, 413, 417, 419-20, 424, 439, 441-42, 445, 447, 449, 452, 453, 454, 467, 469, 471, 475, 477, 480, 484-85, 493, 495, 498, 506-07.)  The

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

[4] Although the Court has considered the entire record, the Court is recommending remand based on the ALJ's findings at step four and therefore does not address all of Mr. Cordova's arguments and corresponding medical

majority of Mr. Cordova's complaints focused on chronic lumbar, thoracic, and cervical pain, as well as bilateral shoulder/biceps pain.  Mr. Cordova also presented with complaints of hand and wrist pain.  (Tr. 412, 413, 417, 441, 443, 494.)

**(2)**     **Radiologic Studies**

Mr. Cordova had a number of radiologic diagnostic studies due to the ongoing nature of his musculoskeletal pain.   On November 19, 2009, Mr. Cordova had an MRI of his right shoulder which suggested a possible rotator cuff tear or tendinopathy.  (Tr. 305.)  On December 11, 2009, Mr. Cordova had radiologic studies to evaluate his low back pressure and spasms and was diagnosed with mild degenerative disc disease with the greatest involvement at L4/5.  (Tr. 310.)  On March 16, 2010, Mr. Cordova had an MRI of his lumbar spine to evaluate chronic lower back pain.  (Tr. 313-14.)  The report indicated "small posterior disc extrusions at L4/L5 and L5/S1 . . . without spinal stenosis." On March 27, 2010, Mr. Cordova had radiologic studies of his hands.  (Tr. 512.)  The reports indicated early degenerative changes with marginal spurring in the left hand, and a chronic versus acute fracture of the third digit in his right hand, along with osteoarthritis.  (Tr. 512.)  On February 15, 2011, Mr. Cordova had a thoracic spine MRI.  (Tr. 496.)  The report indicates "[s]ubtle edema within the T6 vertebral body noted of uncertain clinical significance."  (Id.)  On November 10, 2011, Mr. Cordova had a lumbosacral spine MRI for worsening low back and leg pain.  (Tr. 461.)  The MRI revealed "[d]isc space narrowing and loss of signal . . . at L4/5 and L5-S1."  (Id.)  The report noted that the overall appearance was relatively similar to Mr. Cordova's MRI of March 16, 2010, and that Mr. Cordova may benefit from lumbar steroid injection.  (Id.)

---

history.

(3)    **Treatment**

Given these studies in correlation with Mr. Cordova's subjective complaints,

Mr. Cordova's healthcare providers ordered various modes of treatment, including steroid

injections, physical therapy and medications.

(a)    **Steroid Injections**

The records indicate Dr. McCoy administered one steroid injection for Mr. Cordova's

shoulder pain on January 18, 2011 (Tr. 498); Dr. Elliott administered three bilateral

transforaminal epidural injections for his chronic lumbar pain on April 22, 2010, September 14,

2010, and March 22, 2011 (Tr. 445, 454, 508); and PA-C Martin administered a

methylprednisolone acetate injection for cervical pain on October 14, 2011 (Tr. 481).  While the

injections brought short-term relief, Mr. Cordova continued to complain of pain.  (Tr. 408,

439,449-50, 452, 453, 480, 493, 495.)

(b)    **Physical and Occupational Therapy**

Mr. Cordova also had physical therapy for both shoulders and his right hand.  The

records indicate Mr. Cordova was referred to Taos Center for Rehabilitation and Sports Medicine

on February 8, 2010, for shoulder therapy.  (Tr. 295.)  Physical Therapist Charlotte Messina

evaluated and assessed Mr. Cordova with "symptoms consistent with right shoulder ID [internal

derangement], RC [rotator cuff] afflictions, biceps tendonitis, shoulder impingement, decreased

ROM [range of motion], strength, shoulder/scapular dyskinesia, decreased function and

mobility."  (Tr. 297.)  She recommended six weeks of physical therapy to include manual

therapy, therapeutic exercises, electrical stimulation and hot/cold packs.  (Id.)  Mr. Cordova had

thirteen physical therapy sessions over the course of approximately thirteen weeks from

February 8, 2010, through May 11, 2010.  (Tr. 271-289.)  Although Mr. Cordova's physical

therapy initially focused on his right shoulder, Mr. Cordova began to complain of left shoulder

pain and on March 19, 2010, he was referred for left shoulder physical therapy as well.

(Tr. 283.)  On May 11, 2010, Mr. Cordova reported "the shoulders are okay, the R [right] side is

better than the Left side. . . .   Pt. reports [that while] the [right] side is still painful, [he] is able

to use it more and move it more now."  (Tr. 271.)  Mr. Cordova reported that he was getting an

MRI of the left shoulder.  (Id.)

Mr. Cordova was referred to Deb Jones Therapies, Inc., for occupational hand therapy in

Taos, New Mexico, on April 20, 2010.  (Tr. 325.)  Mr. Cordova had four hand therapy sessions

with Therapist Deb Jones over the course of approximately five weeks from April 20, 2010,

through May 25, 2010.  (Tr. 326-330.)  On May 25, 2010, Mr. Cordova reported to Ms. Jones

that "I'm doing good now and I don't think I need to come anymore."  (Tr. 330.)  Ms. Jones

noted that Mr. Cordova had a full active range of motion of his right wrist without pain, and that

he had a full active range of motion/strength/coordination of his right hand without pain.  (Id.)

**(c)**     **Medications**

In addition to steroid injections and physical/occupational therapy, Mr. Cordova's

healthcare providers also prescribed a variety of pain medications over the course of his

treatment including: Ibuprofen, Cyclobenzaprine,[5] Gabapentin,[6] Hydrocodone,[7] Diclofenac,[8]

Percocet,[9] Oxycodone,[10] Amitriptyline,[11] Lidoderm[12] and Flector[13] patches, and Zanaflex.[14]

---

[5] Cyclobenzaprine is a muscle relaxant.  http://www.drugs.com/cyclobenzaprine.html.

[6] Gabapentin is used in adults to treat nerve pain.  http://www.drugs.com/gabapentin.html.

[7] Hydrocodone is an opioid pain medication.  http://www.drugs.com/hydrocodone.html.

[8] Diclofenac is used to treat mild to moderate pain.  http://www.drugs.com/diclofenac.html.

[9] Percocet is used to relieve moderate to severe pain.  http://www.drugs.com/percocet.html.

[10] Oxycodone is an opioid pain medication.  http://www.drugs.com/oxycodone.html.

[11] Amitriptyline is used to treat symptoms of depression.  http://www.drugs.com/amitriptyline.html.

[12] Lidoderm patch is a local anesthetic.  http://www.drugs.com/cdi/lidoderm-patch.html.

(Tr. 408, 412, 413, 443, 447, 453, 466, 467, 469, 471, 475, 477, 493.)  On December 19, 2011,

Mr. Cordova reported some drowsiness with Gabapentin.  (Tr. 469.)  On January 20, 2012,

Mr. Cordova reported some fatigue associated with Amitriptyline.  (Tr. 466.)

### (d)     Wrist Braces and TENS Unit

Dr. McCoy prescribed wrist braces for Mr. Cordova's carpel tunnel syndrome on

February 11, 2010.  (Tr. 418.)  Mr. Cordova was advised to wear them with any activity and at

night.  (Id.)  Mr. Cordova reported to Dr. Elliott some weakness and numbness in both hands as a

result of his carpel tunnel syndrome.  (Tr. 439, 441.)  On June 3, 2010, Mr. Cordova began using

a TENS (Transcutaneous Electrical Nerve Stimulation) unit for his chronic shoulder and back

pain.  (Tr. 340, 418, 477.)

### (4)     Most Recent Treatment Notes

The record indicates Mr. Cordova last saw PA-C Holmes on June 21, 2011, for persistent

thoracic spinal pain and lower back pain.  (Tr. 439.)  PA-C Holmes reviewed Mr. Cordova's

radiologic studies and performed a physical exam.  (Id.)  She noted Mr. Cordova exhibited no

pain behaviors or symptom magnification and non-antalgic/non-spastic gait.  (Id.)  Mr. Cordova

experienced cervical pain with right and left rotation, but no pain with extension, and only

minimal pain on the left side with flexion.  (Id.)  PA-C Holmes further noted that Mr. Cordova

"has full range of motion of the thoracic spine with tenderness at approximately T6 to palpation."

(Id.)  Her impression was as follows:

1)     L4-5, L5-S1 central disc protrusion with extrusion without spinal stenosis.

2)     L3-4 through L5-S1 facet arthropathy.

---

[13] Flector Patches are used to treat pain caused by minor sprains, strains, or bruising.
http://www.drugs.com/flector.html
[14] Zanaflex is a short-acting muscle relaxer.  http://www.drugs.com/zanaflex.html.

3)      Mild degenerative disc disease of the thoracic spine with subtle edema in the T6 vertebral body which may represent contusion of a reactive process, waiting for bone scan.[15]

4)      C3-C4 disc protrusion/extrusion that minimally abuts the cord and minimally elevates the ligament.  There is minimal right lateral recess and foraminal narrowing noted.

5)      Left shoulder pain with supraspinatus tendenitis [sic] without tear, AC joint arthritis and biceps tendinopathy.

(Tr. 439-40.)  PA-C Holmes did not provide a treatment plan in her notes on this date.

Mr. Cordova saw PA-C Martin eight times from July 2011 through January 2012 with complaints, *inter alia*, of lower back and cervical pain.  (Tr. 466-486.)  PA-C Martin prescribed pain medications as Mr. Cordova indicated he had some relief with medication.  (Tr. 475.)  On October 14, 2011, PA-C Martin notes that Mr. Cordova was scheduled for another epidural injection "next week"; however, the records do not contain evidence of an epidural injection in October/November 2011.  (Tr. 480.)

**(5)      Medical Source Statement by PA-C Martin**

On March 2, 2012, PA-C Martin prepared a Medical Source Statement: Physical Limitations on Mr. Cordova's behalf.  (Tr. 521-526.)  PA-C Martin indicated that Mr. Cordova's experience of pain and other symptoms constantly interfere with Mr. Cordova's attention and concentration and he is incapable of even a low stress job.  (Tr. 522.)  PA-C Martin indicated that Mr. Cordova can sit at one time for 10 minutes, can stand at one time for 15 minutes, and can sit and stand/walk for less than two hours in an eight-hour working day.  He states that any job worked by Mr. Cordova would need to allow for at-will sitting, standing and walking, with

---

[15] On April 26, 2011, PA-C Holmes ordered a "whole body bone scan for evaluation of reactive process or tumors." (Tr. 442.)

unscheduled breaks every ten minutes, for up to fifteen minutes.  (Tr. 523.)  The statement

indicates that Mr. Cordova can lift less than 10 pounds; can rarely look down, turn his head right

or left, stoop, crouch/squat, or climb stairs; can never look up, twist, or climb ladders; has

significant limitations with reaching, handling and fingering; and that all of Mr. Cordova's days

are "bad days" with respect to his impairments.  (Tr. 523-24.)

**(6)**   **"To Whom It May Concern" Letter by PA-C Martin**

On March 2, 2012, PA-C Martin also provided a "To Whom It May Concern" letter

stating:

> Due to the nature of his medical problems in combination, especially the
> degeneration of his cervical, thoracic and lumbar spine causing chronic pain
> requiring narcotic analgesics, Mr. Cordova is not physically capable to work
> during the remainder of his lifetime.
>
> His disability due to these medical conditions is permanent.

(Tr. 526.)

**B.**   **High Blood Pressure**

Mr. Cordova was followed for high blood pressure by Dr. McCoy and PA-C Martin of El

Centro Family Health and Peñasco Clinic.  On August 24, 2009, Dr. McCoy increased Mr.

Cordova's Lisinopril[16] to 20 mg./day for management of hypertension.  (Tr. 427.)  Then on

September 2, 2010, Mr. Cordova presented with concerns of increased blood pressure.  (Tr. 403.)

Dr. McCoy advised Mr. Cordova to follow up with weekly blood pressure readings and

increased his Lisinopril to 40 mg./day.  (Tr. 403.)  However, on August 23, 2011, PA-C Martin's

notes indicate Mr. Cordova continued on Lisinopril at 20 mg./day.  (Tr. 459.)

---

[16] Lisinopril is used to treat high blood pressure (hypertension), congestive heart failure, and to improve survival
after a heart attack.  http://www.drugs.com/lisinopril.html.

C.      **Diabetes**

Mr. Cordova was followed for diabetes by Dr. McCoy and PA-C Martin of El Centro Family Health and Peñasco Clinic.  On August 24, 2009, Dr. McCoy indicated that Mr. Cordova's diabetes was nearly controlled.  (Id.)  Thereafter, on January 13, 2010, Dr. McCoy noted that Mr. Cordova's diabetes is under "excellent control."  (Tr. 420.)  On July 7, 2010, Dr. McCoy noted that Mr. Cordova's diabetes was well controlled.  (Tr. 409.)  PA-C Martin's notes as of August 23, 2011, indicated that Mr. Cordova's diabetes continued to be well controlled.  (Tr. 485.)

D.      **Depression and Memory Problems**

Mr. Cordova was followed for depression by Dr. McCoy, Dr. Harrison, and PA-C Martin of El Centro Family Health and Peñasco Clinic.  On November 2, 2009, Mr. Cordova's two-question depression screen was negative.  (Tr. 424.)  On December 2, 2009, Mr. Cordova reported feeling depressed due to being laid off from work.  (Tr. 422-23.)  Dr. McCoy started Mr. Cordova on Celexa.[17]  (Tr. 422-23.)  On March 26, 2010, Dr. McCoy increased Mr. Cordova's dose of Celexa to 40 mg. daily.  (Tr. 413.)  On July 16, 2010, Mr. Cordova reported depression since 2007 due to job loss, injuries, and the serious illness of his mother.  (Tr. 406.)  Mr. Cordova stated he had been taking Celexa, but switched to Wellbutrin[18] in July 2010 with good response.  (Id.)  Dr. McCoy advised Mr. Cordova to continue on Wellbutrin.  (Tr. 407.)  On January 18, 2011, Mr. Cordova indicated no improvement with increased dose of Wellbutrin and that he still feels like staying away from people.  (Tr. 499.)  On February 24, 2011, Mr. Cordova reported his mood still not much better on Wellbutrin.  (Tr. 495.)  On April

---

[17] Celexa is an antidepressant.  http://www.drugs.com/celexa.html.

[18] Wellbutrin is an antidepressant medication.  http://www.drugs.com/wellbutrin.html.

15, 2011, Mr. Cordova states his mood is better on Venlafaxine[19] and admits to feeling a little happier.  (Tr. 494.)  On July 25, 2011, Mr. Cordova reported to Douglas North, PA-C that he did not have a depressed mood or suicidal thoughts.  (Tr. 488.)  On August 23, 2011, PA-C Martin discontinued Venlafaxine and instructed Mr. Cordova to continue on Wellbutrin.  On October 14, 2011, Mr. Cordova's depression screening noted that Mr. Cordova was not feeling depressed.  (Tr. 480.)  On December 2, 2011, PA-C Martin screened Mr. Cordova for depression and indicated Mr. Cordova was mildly depressed.  (Tr. 471.)

### E.    Miscellaneous Complaints

On December 11, 2009, Mr. Cordova was referred by Dr. McCoy for an abdominal ultrasound to evaluate elevated liver enzymes.  (Tr. 516.)  The ultrasound study showed "[e]chogenic liver probably representing hepatic steatosis [fatty liver]."  (Id.)

On May 17, 2010, Mr. Cordova presented to El Centro Family Health with complaints of left calf pain/cramps for four days.  (Tr. 410.)  Mr. Cordova was referred by Dr. Laura Morales for a Doppler study to assess for deep vein thrombosis.  (Id.)  The Doppler study revealed no evidence of deep vein thrombosis.  (Tr. 398.)

On August 13, 2010, Mr. Cordova reported to Dr. McCoy that he was experiencing dizziness that was affecting his balance.  (Tr. 405.)  On August 23, 2011, Mr. Cordova reported to PA-C Martin that he had experienced a fall due to dizziness and injured his right arm/shoulder area.  (Tr. 484.)

### F.    Function Report

On April 27, 2010, Mr. Cordova completed a function report, in which he stated that his medical conditions impact his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb

---

[19] Venlafaxine is an antidepressant.  http://www.drugs.com/venlafaxine.html.

stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others.  (Tr. 192.)  Mr. Cordova reported that he could lift about 15 to 20 pounds; walk one-half mile; sit for 15 to 20 minutes; stand for 10-15 minutes; and kneel for 15 minutes.  (Id.)  He further stated that squatting and bending are very painful on his back, and that reaching affects his shoulders.  (Id.)

Mr. Cordova reported that he has difficulty with his personal care, is only able to prepare simple meals, and can attend to household chores such as cleaning, laundry, bringing wood in for the night, vacuuming, and minor auto repair.  (Tr. 188-89.)  Mr. Cordova indicated that he shops monthly for food, clothing and personal care items, but he tries to get in and out as quickly as possible.  (Tr. 190.)  Mr. Cordova stated that he hardly goes to events or places, but will attend church for specific functions such as family funerals.  (Tr. 191.)

On September 21, 2010, in an updated function report, Mr. Cordova reported that his medical conditions impact his ability to lift, squat, bend, stand, reach, walk, sit, talk, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others.  (Tr. 216.)  Mr. Cordova stated he can lift no more than 30 pounds; walk about one-quarter mile; and stand for about 15 minutes.  (Id.)  Mr. Cordova reiterated that squatting and bending are painful on his back, and described reaching as very painful on his right shoulder. (Id.)

Mr. Cordova reported that he has difficulty with his personal care, is only able to prepare simple meals, and can attend to small household repairs, cleaning and laundry.  (Tr. 212-13.)  In addition, he shops monthly for food, clothing and personal care items, but he tries to get in and out as quickly as possible because he does not like to be around many people.  (Tr. 214.) Mr. Cordova stated that he does not socialize very often because he wants to be alone most of the

time.  (Tr. 216.)  He attends church for specific functions such as funerals, and will attend family gatherings once in a while.  (Tr. 215.)

### G.      Physical Residual Functional Capacity Assessment – Eileen M. Brady, M.D.

On June 14, 2010, non-examining State agency medical consultant Eileen M. Brady, M.D., prepared a Physical Residual Functional Capacity Assessment based on her review of Mr. Cordova's medical records and Function Report. (Tr. 369-376.)  Dr. Brady assessed Mr. Cordova's exertional limitations as (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; and (5) unlimited push and/or pull capacity. (Tr. 370.) Dr. Brady assessed that posturally Mr. Cordova could frequently climb, stoop, kneel and crouch, but only occasionally balance or crawl due to his shoulders. (Tr. 371.) Dr. Brady assessed that Mr. Cordova's manipulative limitations, *i.e.,* handling, fingering and feeling, were unlimited, but that his "bilateral reaching [in all directions] is limited due to bilateral biceps tendon ruptures."  (Tr. 372.)  Dr. Brady did not indicate any further limitations.

### H.      Disability Determination Examination – Michael Gzaskow, M.D.

On June 17, 2010, agency consultant Dr. Michael Gzaskow of the New Mexico Disability Determination Services evaluated Mr. Cordova to determine disability.  (Tr. 377-381.) Mr. Cordova reported he was applying for Social Security on the basis of both physical and mental problems.  (Tr. 377.)  Mr. Cordova reported a history of non-insulin dependent diabetes mellitus since 1999, degenerative disk disease with low back pain since early 1990s, bone spurs related to lower back pain, right and left shoulder pain, and arthritis in both his right and left wrists.  (Tr. 377-78.)  Mr. Cordova also reported increased depression and anxiety related to his mother's illness and passing.  Mr. Cordova indicated he tends to isolate himself and withdraw

from social contact.  (Tr. 377-78.)  Dr. Gzaskow noted that Mr. Cordova was neatly dressed, had

an appropriate expression, and was cooperative.  (Tr. 380.)  He also noted that Mr. Cordova's

mood was "depressed with a sad and flattened affect as we reviewed his somewhat

schizoid/solitary withdrawn lifestyle."  (Id.) Dr. Gzaskow's diagnostic impression of

Mr. Cordova was as follows:

> Axis I:[20]   Mood disorder secondary to general medical condition as noted
> above,[21] with depression/anxiety ratio at 70/30.
>
> Axis II:[22]   No diagnosis.
>
> Axis III:[23]   1.   Diabetes mellitus (non-INSULIN dependent)
> 2.   Hypertension
> 3.   Hypercholesterolemia
> 4.   Right and left shoulder pain
> 5.   Degenerative disk disease
> 6.   Arthritis to right and left hand
> 7.   Chronic alcohol abuse (past) . . . in full, current remission.

(Tr. 381.)  Dr. Gzaskow concluded:

> 1.   When claimant _____ [sic], this is often compromised by his
> depression and isolation/withdrawal and schizoid lifestyle.  He can
> understand and follow directions and instructions in a
> structured/supportive environment, but indicates his structure is limited by
> his orthopedic pain and depression and isolation/withdrawal.
>
> 2.   He can attend to simple tasks.

(Tr. 381.)

---

[20] Clinical syndromes.

[21] Noted medical conditions included (1) diabetes mellitus (non-Insulin dependent); (2) hypertension; (3) increased cholesterol; (4) depression; (5) left shoulder tendon tear with chronic pain; (6) right shoulder rotator cuff chronic pain; (7) hemorrhoids; and (8) chronic lower back pain.  (Tr. 379.)

[22] Developmental Disorders and Personality Disorders.

[23] Physical conditions.

**I.      Psychiatric Review Technique – Scott R. Walker, M.D.**

On August 5, 2010, non-examining State agency medical consultant Scott Walker, M.D., prepared a Psychiatric Review Technique based on his review of Mr. Cordova's medical records and Function Report. (Tr. 384-87.)  Dr. Walker determined that Mr. Cordova's affective disorder, *i.e.*, mood disorder secondary to general medical conditions with depression, only mildly limited his ability to maintain social functioning, as well as concentration, persistence, or pace. (Tr. 394.)  Otherwise, Mr. Cordova had no functional limitations as a result of affective disorder.  (Id.)

**J.      Case Analysis – N. D. Nickerson**

On October 28, 2010, non-examining State agency medical consultant N. D. Nickerson, M.D., prepared a Case Analysis.  (Tr. 436.)  Dr. Nickerson notes that in addition to the medical conditions reviewed by Dr. Brady, Mr. Cordova was alleging vertigo, arthritis/carpal tunnel and fracture of right hand, elevated liver enzymes, poor control of diabetes, deep vein thrombosis of right leg, and epidural steroid for lower back pain.  (Id.)  Dr. Nickerson reviewed additional medical evidence in the record and concluded that "[t]he additional MER [Medical Evidence of Record] appears consistent with the prior assessment, and describes no significant change/decline in claimant's physical status."  Dr. Nickerson stated it was reasonable to affirm Dr. Brady's physical RFC assessment dated June 14, 2010.  (Id.)

**K.      Case Analysis – Alvin Smith, Ph.D.**

On November 6, 2010, non-examining State agency medical consultant Alvin Smith, Ph.D., prepared a Case Analysis.  (Tr. 437.)  Dr. Smith stated "[t]he medical and non-medical evidence has been reviewed in its entirety including the additional treatment notes documenting

ongoing mild depression that responds well to adjustments in medication." (Id.) Dr. Smith affirmed the Psychiatric Review Technique prepared by Dr. Walker on August 5, 2010. (Id.)

## V. HEARING TESTIMONY

The ALJ held a hearing on March 28, 2012. (Tr. 32-55.) Mr. Cordova appeared in person with his attorney Aaron W. Fields.[24] *Id.* Mr. Cordova's attorney made a brief opening statement, at which he stated that Mr. Cordova suffers from lumbar disc degeneration with constant low back pain, thoracic back pain with muscle spasms, cervical disc degeneration with limited neck range of motion and chronic pain, bilateral carpel tunnel syndrome, right rotator cuff syndrome, diabetic retinopathy, diabetes type 2, depression, hyperlipidemia, and steatohepatitis (nonalcoholic). (Tr. 36.) The ALJ then took testimony from Mr. Cordova (Tr. 36-52), and an impartial vocational expert ("VE"), Pamela Ann Bowman. (Tr. 52-54.) Mr. Cordova testified that he most recently worked as a companion for 12 hours a week. (Tr. 38-39.) He testified that he has severe pain in his back, wrists, and shoulders, and suffers from depression. (Tr. 40, 42, 45.) He testified that the medication he takes makes his groggy and he sleeps three to four hours during the day. (Tr. 40, 53.) Mr. Cordova further testified that because of the pain he suffers, he cannot sit or stand for very long, he must take extra time to get himself bathed and dressed, and he is limited in his ability to perform chores around his house. (Tr. 43-46.) Mr. Cordova testified that he tends to stay away from crowds because it is difficult for him to be around people. (Tr. 47.)

The ALJ next questioned the VE. The VE testified regarding the exertional levels of Mr. Cordova's past work as a construction worker, heavy equipment operator, and companion. (Tr. 54.) The ALJ then presented the following hypothetical to the VE:

[A]ssuming a person of the same age, education and work history as the claimant, can perform light work, can occasionally climb stairs but no ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; can occasionally reach [INAUDIBLE] and should have only occasional interaction with the general public.  Would such a person be able to perform the claimant's past work?

(Tr. 54-55.)  The VE's response to the ALJ's hypothetical is uncertain because the transcript that follows contains a number of inaudible gaps.  (Tr. 55.)

Mr. Cordova's attorney then questioned the VE.  Mr. Fields modified the ALJ's inaudible hypothetical to include Mr. Cordova's need to sleep during the day due to the side effects of his medications and lack of sleep.  (Tr. 55.)  The transcript reflects an incomprehensible response to this hypothetical.  (Id.)

## VI. THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Mr. Cordova's application for benefits according to the sequential evaluation process, and on June 22, 2012, found that Mr. Cordova was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits.  (Tr. 13-24.)  At step one, the AJJ found that Mr. Cordova had not engaged in substantial gainful activity since the alleged onset date of February 28, 2010.[25]  (Tr. 15.)  Because Plaintiff had not engaged in substantial gainful activity for at least 12 months, the ALJ proceeded to step two and found that Plaintiff suffered from the following severe impairments:  "degenerative disc disease of the lumbar and cervical spine, and Left [sic] rotator cuff syndrome."  (Tr. 15.)  The ALJ also found that Mr. Cordova had non-severe impairments of diabetes, hypertension, fractured finger, and depression.  (Tr. 15-16.)  At step three, the ALJ concluded that Mr. Cordova did not have an

---

[24] Mr. Cordova is represented in this action by Attorney Helen Lopez.
[25] While Mr. Cordova did work part-time as a companion after the alleged disability onset date, the ALJ found that "this work did not rise to the level of substantial gainful activity."  (Tr. 15.)

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Id.)

Because none of Mr. Cordova's impairments met a Listing, the ALJ went on to assess Plaintiff's residual functional capacity ("RFC").  In making the RFC assessment, the ALJ relied on "the claimant's treating medical sources, the consulting physicians, the State Agency medical physicians, the claimant's testimony and the record as a whole."  (Tr. 23.)  The ALJ gave "little weight" to treating provider James Martin,  PA-C's March 2012 opinion that Mr. Cordova could only engage in less than sedentary work because "Mr. Martin is not considered to be an acceptable medical source under the guidelines of SSR 06-3p" and "it appears to contrast with the other evidence of record, which renders it less persuasive."  (Tr. 22.)  The ALJ gave "great weight" to the June 2010 opinions of non-examining State Agency medical consultants, Dr. Brady and Dr. Nickerson who concluded that the claimant could perform light work activities with postural and manipulative limitations.  (Id., Tr. 369-376, 436.)  In so doing, the ALJ reasoned that Dr. Brady's opinion "*is not consistent with the objective findings in the record*."  (Tr. 22) (emphasis added).  The ALJ gave "significant weight" to the opinion of one-time examining State Agency psychiatric consultant Dr. Michael Gzaskow that Mr. Cordova "could understand and follow directions and instructions in a structured environment, as well as having the capacity to attend to simple tasks."  (Tr. 21.)  The ALJ found that through the date last insured:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can only occasionally climb stairs; cannot climb of [sic] ladders or scaffolds; can occasionally balance, stoop, kneel, crouch or crawl; can perform occasional reaching with no overhead reaching;[26] and can have only occasional interaction with the public.

---

[26] The Court notes an inconsistency in the ALJ's assessment regarding Mr. Cordova's inability to reach overhead

(Tr. 17, 21-23.)  Finally, the ALJ concluded that Mr. Cordova was capable of performing past relevant work as a companion.  (Tr. 23.)

On June 22, 2012, Mr. Cordova appealed the decision to the Appeals council.  On July 25, 2013, the Appeals Council denied Mr. Cordova's request for review finding that his reasons for disagreeing with the decision did not provide a basis for changing the ALJ's ruling.  (Tr. 1-3.) In so doing, the Appeals Council rendered the ALJ's decision the final decision of the Commissioner.  (Tr. 1.)

## VII. ANALYSIS

Mr. Cordova raises nine issues in support of reversing and remanding his case as follows: (1) the record of the hearing is partially inaudible and the transcript is incomplete; (2) the finding that Mr. Cordova can return to his past work is not based on substantial evidence and is based on inconsistent findings; (3) the ALJ failed to conform her findings to the DOT or clarify them contrary to *Haddock v. Apfel*, 196 F.3d 1084 (10th Cir. 1999); (4) the RFC failed to include manipulative and mental impairments; (5) the ALJ is required to include "non-severe" impairments at step four; (6) the ALJ mischaracterized the psychiatric evidence; (7) the ALJ's credibility assessment is flawed; (8) the ALJ's assessment of Dr. Elliott's opinion is not supported by substantial evidence; and (9) the ALJ's reliance on 2010 RFC assessments by non-examining evaluators is not supported by substantial evidence.  (Doc. 31.)  Because the Court finds grounds for recommending remand as discussed below, the Court does not specifically analyze all of Mr. Cordova's arguments.

---

and her summation wherein she states that he can "occasionally reach overhead." (Tr. 23.)

### A.   **Step Four Findings**

Mr. Cordova attacks the ALJ's step-four analysis and argues that the ALJ's RFC assessment and determination that he can perform his past relevant work is not supported by substantial evidence.  The step-four analysis is comprised of three phases.

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC) , . . . , and in the second phase, [s]he must determine the physical and mental demands of the claimant's past relevant work. . . .  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  At each of these phases, the ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1021 (10th Cir. 1996) (citations omitted).  In determining a claimant's physical and mental abilities at phase one, the ALJ should "first assess the nature and extent of [claimant's] physical limitations and then determine [the claimant's] residual functional capacity for the work activity on a regular and continuing basis."  20 C.F.R. § 404.1545(b).  The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe.  *See* 20 C.F.R. § 404.1545(d); *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010).  "[T]he ALJ must make specific findings," *Winfrey*, 92 F.3d at 1023, that are "supported by substantial evidence."  *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999).  The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence.  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.  SSR 96-8p, 1996 WL 374184, at *7.

Finally, the RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.  *Id.*

### 1.   Phase One

In evaluating Mr. Cordova's RFC, the ALJ discussed the medical records related to Mr. Cordova's severe impairments of degenerative disc disease of the lumbar and cervical spine and Mr. Cordova's left rotator cuff syndrome, and discussed Mr. Cordova's non-severe impairments of diabetes, hypertension, fractured finger and depression.  (Tr. 17-23.)  She cited to medical source opinions and explained what weight she afforded each medical source and why she did not adopt certain opinions.  (Id.)  She also described Mr. Cordova's work activities as reported by Mr. Cordova.  Based on her review of the record and having heard testimony from Mr. Cordova, the ALJ concluded Mr. Cordova has the physical and mental abilities to perform light work.  (Tr. 17, 23.)

### (a)   Evaluation of Other Source Opinion

Mr. Cordova argues that the ALJ erred in rejecting PA-C Martin's medical source statement regarding his functional limitations.  PA-C Martin indicated that Mr. Cordova can sit at one time for 10 minutes, can stand at one time for 15 minutes, and can sit and stand/walk for less than two hours in an eight-hour working day.  (Tr. 523.)  He states that any job worked by Mr. Cordova would need to allow for at-will sitting, standing and walking, with unscheduled breaks every ten minutes, for up to fifteen minutes.  (Id.)  He further indicated that Mr. Cordova can lift less than 10 pounds; can rarely look down, turn his head right or left, stoop, crouch/squat, or climb stairs; can never look up, twist, or climb ladders; has significant limitations with reaching, handling and fingering; and that all of Mr. Cordova's days are "bad days" with respect

to his impairments.  (Id.)  Thus, in PA-C Martin's opinion, Mr. Cordova is incapable of a full range of light work even with the postural and manipulative limitations included by the ALJ.

In rejecting PA-C Martin's opinion, the ALJ stated that PA-C Martin is not considered to be an acceptable medical source under the guidelines of SSR 06-3p, and that she gave his opinion little weight because his opinion conflicted with other evidence in the record and was less persuasive.  (Tr. 22.)  The ALJ further stated that because Dr. Elliott, Mr. Cordova's treating physician for his chronic back and neck pain, had chosen to treat Mr. Cordova conservatively and did not place any restrictions on Mr. Cordova's daily activities, this supported her decision to give great weight to nonexamining State Agency medical consultant Dr. Brady's opinion that Mr. Cordova could perform a full range of light work with some postural limitations.  (Id.)

Here, the ALJ's reasoning for the weight she assigned is flawed from the outset because her reliance on Dr. Elliott's treatment as grounds for giving great weight to non-examining medical consultant Dr. Brady is misplaced.  A review of the record indicates that the ALJ's summary of Dr. Elliott's June 21, 2011, impression (Tr. 22) is based on a progress note prepared by PA Holmes that contains her impression of Mr. Cordova.  (*See* Tr. 439-440.)  In fact, most of the records from the Spine and Pain Institute of Santa Fe contained in the administrative transcript are attributable to PA Holmes and not to Dr. Elliott.  (*See* Tr. 439-444, 447-453, 502-503.)  Thus, the ALJ's reliance on Dr. Elliott to support her giving great weight to Dr. Brady is fundamentally flawed, and particularly troubling given she gave little weight to PA-C Martin's opinion because of his *other medical source* status.

Generally, the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  Admittedly, PA-C Martin is not a

physician, psychologist, or other medical professional within the meaning of an "acceptable medical source" as defined by the regulations.  20 C.F.R. §§ 404.1513(a), 416.913(a).  Because PA-C Martin is not an "acceptable medical source," he is also, by definition, not a treating source.  20 C.F.R. §§ 404.1502, 416.902 (a treating source is limited to physician, psychologist or other acceptable medical source).  As such, he is an "other medical source" within the meaning of SSR 06–3p and the regulations, and his opinions must be weighed in accordance with that ruling. *See also,* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (defining "other medical sources").

SSR 06-3p explains that if a treating source opinion is not given controlling weight, opinions of other medical sources, such as physician assistants, will be evaluated using the same regulatory factors used for evaluating medical opinions.[27]  SSR 06-3p (citing 20 C.F.R. §§ 404.1527, 416.927).  The evaluation of an opinion from other sources, both medical and non-medical, depends on the particular facts in each case.  Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.  SSR 06-3p at *3.  In evaluating the evidence from other medical sources, SSR 06-3p states:

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

---

[27] These factors include (1) how long  the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  SSR 06-3p at *4-5.

SSR 06-3p at *4.  These sources may provide evidence "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work."  *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. § 404.1513(d)).

Here, the ALJ relies on an RFC assessment prepared by a nonexamining State Agency medical consultant based on medical record evidence through March 2010, and affirmed on reconsideration based on medical record evidence through September 2010.[28]  (Tr. 371, 436.) Because the ALJ has not given controlling weight to a treating source opinion, the ALJ must evaluate the opinions of other medical sources using the same regulatory factors used for evaluating medical opinions.  The ALJ did not do that here.  Specifically the ALJ failed to account for the ongoing nature of PA-C Martin's relationship with Mr. Cordova and the frequency with which he saw Mr. Cordova.  The ALJ also failed to explain why she relied on medical evidence that predated PA-C Martin's functional assessment by approximately eighteen months.  The record supports that in the weeks and months from September 2010 to the hearing before the ALJ on June 22, 2012, Mr. Cordova saw PA Holmes *six additional times* with complaints of both ongoing lumbar back pain and persistent thoracic spinal pain, and received a bilateral injection by Dr. Elliott (Tr. 439-453); he saw Dr. McCoy *four additional times* with multiple musculoskeletal complaints (Tr. 492-499); and he saw PA-C Martin *eight additional times* with complaints of chronic neck, back and shoulder pain.  (Tr. 466-486.)  It was in this context that PA-C Martin prepared his Medical Source Statement and assessed Mr. Cordova with significant functional limitations.

---

[28] While the Court notes that the ALJ gave "great weight" to Dr. Brady's assessment, her report nonetheless states she is doing so "because it is *not consistent* with the objective findings in this record."  (Tr. 22.)

Additionally, the ALJ's representation that PA-C Martin's assessment conflicts with other evidence in the record is not supported by substantial evidence. Mr. Cordova's persistence in seeking treatment for his musculoskeletal pain aside, Mr. Cordova indicated in his function reports that he can only stand for 10-15 minutes and can only sit for 15-20 minutes. (Tr. 192, 216.) Mr. Cordova further stated that squatting and bending are very painful on his back and that reaching affects his shoulders. (Id.) These representations are in direct conflict with Dr. Brady's assessment that Mr. Cordova can stand and/or walk for about 6 hours in an 8-hour workday and sit for a total of about 6 hours in an 8-hour workday. Moreover, the absence of restrictions by Dr. Elliott and/or PA Holmes does not necessarily serve to support the ALJ's giving great weight to Dr. Brady's assessment, but instead reflects the ALJ's unsupported presumption that their silence in this regard indicates agreement with Dr. Brady's assessment. This presumption is unsupported by substantial evidence.

For these reasons, the ALJ's rejection of PA-C Martin's opinion is misplaced in light of SSR 06-3p, and the ALJ's RFC assessment of Mr. Cordova's functional limitations is not supported by substantial evidence.

### (b)   Depression and Dr. Gzaskow's Opinion

Mr. Cordova argues that in evaluating his RFC, the ALJ mischaracterized Dr. Gzaskow's opinion by choosing only the more favorable parts of his opinion to support her determination. (Doc. 32 at 16.) The ALJ determined that Mr. Cordova could understand and follow directions and instructions in a structured supportive environment and could attend to simple tasks. (Tr. 21.) To that end, the ALJ's RFC assessment provided a mental limitation of "occasional public interaction." Mr. Cordova contends that the ALJ's limitation does not address Mr. Cordova's need for a "structured supportive environment." More significantly, Mr. Cordova

27

argues the ALJ ignored Dr. Gzaskow's opinion regarding his challenges with depression, isolation and a schizoid lifestyle, and that "his structure is limited by these challenges." (Tr. 381.)  The Court agrees.  An ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."  *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).  For this reason, the Court agrees that the ALJ mischaracterized Dr. Gzaskow's opinion in evaluating Mr. Cordova's mental residual functional capacity and the ALJ's mental RFC assessment is not based on substantial evidence.

## 2.    Phase Two

At the second phase of the step-four analysis, the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work.[29]  To make the necessary findings, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations."  *Winfrey*, 92 F.3d at 1024 (citations omitted).  Here, the ALJ elicited testimony at the administrative hearing on March 28, 2012, regarding Mr. Cordova's previous work as a caregiver as follows:

> Q.    . . .  So what work have you done then since your alleged onset date of February 28, 2010?
>
> A.    I have just been a caregiver, and I basically just give the consumer company for two and a half hours a day, for four days and then two hours a day on one of the day.
>
> Q.    Okay, and you did make $12,469 in 2010, is that correct?
>
> A.    I'm not sure, ma'am.

---

[29] Mr. Cordova worked after the alleged disability onset date, but his work did not rise to the level of substantial gainful activity.  He worked part-time during the second, third and fourth quarters of 2010, and in the first quarter of 2011.  (Tr. 15.)

Q.      And then you've been making about $2900 per quarter since then, that's what it shows on your earnings record, that in the first quarter of 2011, the second quarter of 2011, the fourth quarter of 2010, that's what you made?

A.      I'm not sure.

Q.      And what do you do as a caregiver?

A.      As a caregiver I give company to the consumer.

Q.      You [INAUDIBLE] occasion?

A.      No.

Q.      You remind them to take their medication?

A.      Yea [sic], I remind them to take their meds, but I cannot administer them to them.

Q.      You help them in and out of the tub or the toilet?

A.      Sometimes I help him, but most of the time he gets around pretty well.

Q.      You do any cooking?

A.      No.

Q.      [INAUDIBLE] option for your [INAUDIBLE].

A.      No.

(Tr. 37-38.)  In the ALJ's determination, she summarized Mr. Cordova's testimony to say,

"[Mr. Cordova] works part time [as] a caregiver, providing company to an old man."  (Tr. 18.)

The ALJ also included in her determination Mr. Cordova's work-related activities as reported by

Mr. Cordova as follows:

> The claimant completed a function report and stated that he is a caregiver for a 76-year-old man, making his breakfast, making up his bed, doing his laundry once a week, sweeping and mopping floors, help him with his medications and keep him comfortable from 8:30 to 11:15 pm.  He goes home about 3 miles away and returns at 1:30 pm and stays with him until 4:15 pm.

(Tr. 23.)  This is the extent of the information the ALJ provided regarding Mr. Cordova's work as a caregiver.

SSR 82-62 states that "[p]ast work must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work."  SSR 82-62, 1982 WL 31386, at *3.  "The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully[.]"  *Id.* Further, when a mental impairment is involved:

> [C]are must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, *e.g.*, speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

SSR 82-62, 1982 WL 31386, at *3.  Here, the ALJ's inquiry fell woefully short of these regulatory requirements.  Despite Mr. Cordova's alleged disability associated with depression, the ALJ make no inquiry into, or any findings specifying, the mental demands of Mr. Cordova's past relevant work.  In addition, beyond reciting Mr. Cordova's description of his ancillary physical duties, the ALJ elicited little information regarding the impact of these duties in light of Mr. Cordova's physical limitations.  Furthermore, the ALJ failed to adequately investigate Mr. Cordova's actual hands-on care of the consumer.  For example, at the hearing Mr. Cordova testified that he sometimes must help the consumer on and off the toilet or in and out of the bathtub.  (Tr. 37.)  Despite this testimony, the ALJ failed to make further inquiry whether there were other physical demands required in caring for the consumer; *i.e.*, getting him in and out of bed, taking him outdoors, moving him in and out of a wheelchair, or assisting him into a vehicle. This inquiry would have particular importance given Mr. Cordova's severe impairments of

degenerative disc disease and left rotator cuff syndrome, and in light of Mr. Cordova's stated

concerns to Dr. Gzaskow that he "can help him [the consumer] now, but if he [the consumer]

becomes unable to move, I will not be able to help him as my shoulders and arms are so weak."

(Tr. 377.)

For these reasons, the ALJ failed to obtain adequate factual information about the work

demands which have a bearing on Mr. Cordova's medically established limitations.

**3.      Phase Three**

At phase three of the step-four analysis, the ALJ determines whether the claimant has the

ability to meet the job demands found in phase two despite the mental and/or physical limitations

found in phase one.  Mr. Cordova argues that "the description of Mr. Cordova's abilities to

allegedly perform the companion job, omits the ALJ's restrictions of no overhead reaching and

only occasional interaction with the public."  (Doc. 32 at 10.)   The Court agrees.

 After the ALJ determined Mr. Cordova had an RFC to perform light work, she found

that Mr. Cordova could return to his past relevant work as a companion.  The ALJ referred to the

DOT's occupational code number for companion in her findings – 309.677-010, which states:

> Cares for elderly, handicapped, or convalescent persons: Attends to employer's
> personal needs [PERSONAL ATTENDANT (domestic ser.)].  Transacts social or
> business affairs [SOCIAL SECRETARY (clerical)].  Reads aloud, plays cards, or
> other games to entertain employer.  Accompanies employer on trips and outings.
> May prepare and serve meals to employer.  . . .  *STRENGTH: L*  . . .

*See* Dictionary of Occupational Titles, http://www.occupationalinfor.org/30/309677010.html.

The ALJ then concluded that "*[t]his work does not require the performance of work related*

*activities precluded by the claimant's residual functional capacity.*"  (Tr. 23.)  The precluded

work related activities were that Mr. Cordova "can only occasionally climb stairs; cannot climb

of [sic] ladders or scaffolds; can occasionally balance, stoop, kneel, crouch or crawl; can perform

occasional reaching with no overhead reading, and can have only occasional interaction with the public." (Tr. 17.)  However, the ALJ's conclusory statement is insufficient to demonstrate Mr. Cordova's ability to meet the physical and mental demands of his past relevant work despite his nonexertional impairments of no overhead reaching and depression, particularly when the DOT job description for companion does not account for these limitations.

Here, the ALJ determined that Mr. Cordova can have only occasional interaction with the general public.  However, the DOT description suggests there could be more than occasional interaction with the general public; *i.e.,* accompanies employer on trips and outings.  The ALJ does not explain this apparent discrepancy.  Additionally, SSR 85-15 instructs that:

> Reaching (extending the hands and arms in any direction) . . . is required in almost all jobs.  Significant limitations of reaching . . . may eliminate a large number of occupations a person could otherwise do.  Varying degrees of limitations would have different effects, and the assistance of a VS[30] may be needed to determine the effects of the limitations.

SSR 85-15, 1985 WL 56857, at *7.  Given the significant limitation of *no* overhead reaching, and given that the DOT job description does not explicitly preclude overhead reaching, the assistance of a Vocational Expert ("VE") was needed to determine the effects of that limitation.

While the VE was present and testified at the hearing in this matter, her testimony was largely inaudible.  Given the importance of VE assistance, the Court agrees with Mr. Cordova that the inaudible portions of the hearing transcript are, in fact, problematic here.  While the mere presence of inaudible gaps is not grounds for remand or reversal, an ALJ's decision must be based on substantial evidence.  See *Moore v. Chater*, 85 F.3d 641 (Table) (10th Cir. 1996).  Here, the inaudible gaps leave the Court uncertain whether Mr. Cordova's nonexertional impairments were sufficiently addressed by the VE.  While the Tenth Circuit has explained that an ALJ may

not delegate the step-four analysis to the VE, an ALJ is not precluded from asking and relying on a VE to supply information at step four about the demands of the claimant's past relevant work. *Winfrey v. Chater,* 92 F.3d 1017, 1025-26 (10th Cir. 1996).  The assistance of a VE would have been particularly helpful here to determine the effects of Mr. Cordova's nonexertional limitations.

The entire exchange between the ALJ and the VE at the hearing regarding Mr. Cordova's past relevant work and limitations is as follows:

Q.    Now [INAUDIBLE] claimant's past work?

A.    Yes, your honor.

Q.    [INAUDIBLE] categories in terms of exertional skill level and the DOT number?

A.    Yes, your honor.  He was a construction worker, the DOT is 869.664-014. That job's classified as heavy work and semi-skilled with an SVP of 4. He was a heavy equipment operator, that DOT is 859.683-010, that job's classified as medium work and skilled, with an SVP of 5.  And then his current job is the DOT's definition of companion, and that DOT is 309.677-010, and that job is classified as light work and semi-skilled with an SVP of 3.

Q.    All right, and assuming a person of the same age, education and work history as the claimant, can perform light work, can occasionally climb stairs but no ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; can occasionally reach [INAUDIBLE] and should have only occasional interaction with the general public.  Would such a person be able to perform the claimant's past work?

A.    [INAUDIBLE.]

Q.    Well if I, you know, not [INAUDIBLE] deals with all the time.

A.    Yes, I think I would say yes to that job, I'm going to reduce the numbers that I do have for the overhead reach, okay.  And so – from 800,000 in the

---

[30] Vocational Specialist.

national economy, I would reduce [INAUDIBLE] 500 individually [INAUDIBLE].

Q.      Yes, okay.

A.      Yeah, yeah.

(Tr. 53-54.) Presumably the ALJ's hypothetical inquiry to the VE included Mr. Cordova's limitation of no overhead reaching; however, the inaudible gap leaves the Court less than certain. In addition, the response from the VE was inaudible. (Tr. 54.) While the Court notes that had the VE's answer been "no," the ALJ likely would have elicited additional testimony necessary for a step-five analysis, which the ALJ did not do, it is nonetheless *not* safe to assume that the VE answered "yes" given the far-reaching consequences of that assumption. Furthermore, the additional inquiry by the ALJ at the hearing is also peppered with inaudible gaps leaving the Court in the untenable position of filling in the blanks which it will not do.

For these reasons, the ALJ's determination that Mr. Cordova retains the residual functional capacity to do his past relevant work as a caregiver is not supported by substantial evidence.

### B.      **Remaining Issues**

The Court will not address Mr. Cordova's remaining claims of error. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

### VII.      **RECOMMENDATION**

For the foregoing reasons, the Court recommends that Mr. Cordova's Motion to Remand or Reverse be **GRANTED.**

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(c).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to  § 636(b)(1)(c), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen (14) days period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**KIRTAN KHALSA**
**United States Magistrate Judge**